Filed 4/27/16  P. v. Word CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B261513 |
| Plaintiff and Respondent, | (Super. Ct. No. NA093298-01) |
| v. | (Los Angeles County) |
| TREVOR WORD, | |
| Defendant and Appellant. | |

Trevor Word was convicted of the first degree murder of his girlfriend Rachel Bruner (Pen. Code, §§ 187, subd. (a), 189)[1] with a "true" finding that he personally used a firearm (§ 12022.53, subds. (b)-(d)).  The trial court sentenced him to state prison for 50 years to life.  Word contends that the shooting of the victim was her own doing and occurred accidentally as he endeavored to pull the pistol from her mouth as she attempted to kill herself and that, at a minimum, the evidence was insufficient to establish premeditation and deliberation.  He further contends that the trial court improperly instructed the jury not to experiment with the murder weapon; that the prosecutor committed misconduct by misstating the law regarding the presumption of

---

[1] All further statutory references are to the Penal Code.

innocence, the element of premeditation and deliberation, and the burden of proof; and that cumulative error warrants reversal.  We affirm.

FACTS

*Prosecution Evidence*

Bruner was injured in a car accident in which her left arm was completely paralyzed.  About a year later, she and Word, her boyfriend at the time, moved into an apartment in Long Beach.  Their next-door neighbor, Ramon Echeverria, frequently heard them shouting at each other.  Sometimes he heard the sound of glasses or dishes shattering and dull "thud[s]" that "sounded like bodies hitting the wall" or "[f]urniture being knocked around."  Twice he called the police.  Once was in the middle of the night when he heard a "blood-curdling scream from [Bruner] that [lasted] for extended periods of time."  The other time, in the morning when he was getting ready for work, he heard Bruner say something about wanting to leave.

About two weeks before her death, Bruner wrote in her diary, "I am almost out of money....  I'm fighting with him again.  It seems endless.  I know I am sad and shit, but he makes me feel shitty about it.  I shut the door hard.  He started talking shit and got in my face, tried to tell me to keep it open, tried to manhandle me, and I bit the shit out of him.  I love him, but I don't like the feeling that I'm expected to do shit.  I don't have to buy him shit.  I don't need to be the one to ask if he needs to go to work.  It's like he is mad because he cleaned, I didn't say thank you.  He got mad.  He doesn't thank me when I do that shit.  I don't expect it, either....  I'm fucked.  I have to get a job ...."

From the time of Bruner's car accident until her death 15 months later, her mother provided financial support by paying for things such as food, gas, and medical insurance.  On the day of the murder, Bruner went to her mother's home after a doctor's appointment.  Bruner "was sad."  She was always in pain from the accident and the doctor had told her she needed to "address" the accident so that she could "move on."  She was "concerned that she wasn't [going to] have any insurance and she didn't have

2

money."  Her mother reassured her that she had coverage for two more months and that they would "get her some other insurance when [that] was out."  Bruner drove to the bank with her mother, who withdrew $100 which she gave to Bruner for expenses.  She declined her mother's invitation to stay for dinner in order to get parking at home.  As she left, she appeared to be calmer and more content.  About 20 minutes later, her mother texted her that she loved her.  Bruner replied that she loved her too.

Approximately an hour later, Word called 911 from their apartment.  He told the operator, "My girlfriend shot me and shot herself."  When the operator asked him his name, he repeated, "She shot me and shot herself."  He twice stated, "Baby, wake up."  He then told the operator, "She doesn't have a pulse.  Oh my God.  Baby, why'd you do that?"  When the operator asked him to clarify who had been shot, he responded, "She shot me and then shot herself.  I don't know why she shot me."  He later told the operator, "She looks dead.  She went to the psychiatrist today and she was sad."

When the police arrived a few minutes later, Word was seated against the living room wall, facing the door.  He had blood on his face.  He was moaning and appeared to be in pain but was not crying.  Bruner's body was lying on the floor next to him.  He was holding her hand.  A small-caliber revolver was lying in the middle of the room near Bruner's head.  The revolver contained two expended and four unexpended cartridges.

Word told the police that Bruner had gone to the doctor and was very upset when she came home.  He told them that "[s]he went into the bedroom, retrieved a gun, came back out to the living room ..., shot him, and then shot herself."  When asked where he had been shot, he told the police that "he didn't know."  He was very quiet and soft-spoken.  He seemed "[m]ore withdrawn than sad."

When asked by the paramedics what had happened, Word replied that he had shot himself.  He explained that "his girlfriend had gotten home from the doctor's and was very upset and that she managed to get the gun.  He had tried to take the gun away from her, but she managed to get a shot off first."  He told them that "he basically

3

freaked out and shot himself." After being taken to the hospital, Word told medical staff that he and his girlfriend got into an argument when she came home, she shot herself, he called the police, and then, because he "couldn't live without her," he shot himself moments before the police arrived. The emergency room physician who treated Word found a bullet entrance wound below his chin and a bullet fragment at the top of the spine but no exit wound.

The deputy coroner opined that Bruner's death was a "homicide until proven otherwise." Based on the gunshot wound entrance on the left side of her hard palate at the back of her mouth, the soot on her tongue, and the lack of stippling, he concluded that the barrel of the gun was inside her mouth when it was fired. One of her front teeth was chipped. Her right hand had black lines on the palm and base of the thumb, and her fingertips were darker than the rest of her fingers, consistent with "cylinder gap" burns.[2] She had bruises on the inside of her right arm, her right wrist, the thumb and top of her right hand, her left thigh, and both knees.

Troy Ward, a senior criminalist, opined that based on the pattern of black marks on Bruner's hand, she had her hand wrapped around the revolver's cylinder when it was fired. The lines of soot were well-defined rather than dispersed, indicating that she was tightly gripping the gun. A person holding the gun in that position could not pull the trigger using the same hand. Bruner's hand and head injuries were consistent with someone struggling with her and pulling the trigger while the gun was inside her mouth. They were inconsistent with Bruner trying to put the gun into her mouth and it accidentally firing as someone tried to pull it straight out of her mouth.

Sixteen days later, detectives interviewed Word at the hospital when he was extubated in preparation for discharge. Word told them that he and Bruner "were struggling with [their] finances and how [they] were going to come up with rent." He was employed as "a casual longshoreman" but "there's just no work," and even when he

---

[2] A firing revolver emits hot gas from the gap between the cylinder, where the cartridge is located, and the barrel.

did work, a back injury limited what he could do. Their conversation about finances "is what sparked it off." Bruner became very upset and was yelling, crying, and storming around the house "in a blind rage."

Word told the detectives that Bruner took pain medication regularly, which she needed because she had "extreme pain" in her left arm from "a hit and run type incident…. [S]he had been telling [him] that she was just so tired of being in pain that she just wanted … the doctor to just cut her arm off." Word was "struggling" because he did not have health insurance and could not afford his own pain medications for a back injury. Bruner would sometimes give him some of her own painkillers "if she ... had any left over when she got her refill."

Word owned the revolver and used it for home protection since they lived in "a very dangerous neighborhood." He kept the revolver readily accessible next to his side of the bed and had "loaded it month, months ago."

Word stated that he and Bruner were in the living room and she was "insinuating that ... she wanted to harm herself" by saying things such as "I'm sick of my arm. I'm ready." Then "she charged for the bedroom." He "just had a feeling" that she was going to get the gun "so [he] ran ... past her ... to get to it first." He admitted that she had never attempted to fire it before. Bruner's mother testified that "[s]he was not brought up with weapons."

Word told the detectives that Bruner had grabbed the gun, "but [he] had grabbed it out of her hand and ... went to the living room." He "wanted to lock it in the ... gun case." Bruner "was just trying to yank it out of [his] hand." Word explained that "[d]espite her size"—Bruner was 5'5" and weighed 123 pounds whereas Word was about 5'11" and weighed 200 pounds —"she was very strong."

At first, Word told the detectives that Bruner "grabbed [the gun] with both ... hands" around the barrel. Later in the interview, when asked if she had two hands on the barrel, he said, "No, she wasn't able to use her left hand." He said his hands were positioned "how you hold a gun," but he "was trying to keep [his] finger away from the

5

trigger." Later, he stated that his finger "was not on the trigger." Bruner "spun [him] around ... and she grabbed the barrel and put it to her mouth." He "must have clicked [off] the safety" during the struggle. Then the gun "just went off." When Bruner dropped to the ground, Word "didn't know what to do." He "freaked out and ... just grabbed [the gun] and shot [him]self." In response to a question about when he called 911, all Word could remember was that he walked around the apartment looking for his phone so that he could call for help.

*Defense Evidence*

About a month before Bruner's death, she wrote in her diary,[3] "The real actual suicidal tendencies don't present themselves around other people. Only people who are crying out for attention tell other people. That way they can be stopped. I haven't told anyone about the fact that I've been thinking about killing myself for months ever since I killed my baby.[4] I don't get enjoyment out of nothing anymore. I look at the world as it and everyone in it is against me. I don't trust anyone and won't let myself because I don't want to get fucked over. I am so different from everyone I know. The black sheep. I don't even voice half the shit I think about because all anyone ever says is it will be okay, it will get better, it's not that bad, but none of them have any clue how my brain works. And the thoughts in my head are all mine.... All I've succeeded in doing is isolating myself. I don't think it's worth it at times, but then again who is gonna watch out for me besides me?"

About two weeks later, Brunner wrote, "I don't want to be fucking crazy and broken anymore. I can't stop thinking crazy shit. I can't make it stop. I won't ever stay happy for more than a couple of days. I always have to think of myself first because

---

[3] These diary entries were introduced by the prosecution but relied upon primarily by defense counsel.

[4] Word testified that two and a half months before the diary entry, they "found out [they] were pregnant," but because "it was impossible financially" for them to raise a child, Bruner had an abortion.

6

no one else will ever. I don't want to do shit because I don't get excited about nothing. Don't care to work. That's just bullshit. I'm really tired of hurting all the time. I don't want to live like this. I miss my damn arm. Fuck, why didn't I just die that night. I would have been crazy still if it didn't happen. At least then I would be whole. Who the fuck will want me now? I am damaged goods. I don't understand what's wrong with me."

On the day Bruner died, Dr. Joseph Lantz, a clinical psychologist, evaluated her for surgery to implant a spinal cord stimulator, a device that interferes with pain signals along the spinal cord. He was unable to conduct psychological tests because "[s]he became upset and tearful." She told Lantz that "she had been run over and horribly injured in an accident" that "completely changed" her life. She had severe pain "all the time" and described her left arm as a "dead weight" on her body. She was afraid to leave her apartment and wanted to stay isolated there where "no one could hurt [her]." She reported having panic attacks and nightmares and always feeling angry and scared. She said she had lost her job and private medical insurance, her state disability payments had ended, and she had unpaid medical bills totaling more than half a million dollars. She acknowledged having thoughts about suicide but was afraid that something worse would happen to her than had already happened.

Bruner told Dr. Lantz that she had a boyfriend who was supportive. She never reported being mentally or physically abused by him.

Dr. Lantz concluded that Bruner was experiencing post-traumatic stress disorder and "critically needed ... psychiatric and psychological follow[-]up." He determined that she was "at risk for ... further deterioration in her functioning ... , if not suicide." His concern about suicide was "more long term" because, in the short term, she did not have any specific plan to kill herself. He felt that "she was a very strong woman" and was not a danger to herself at the time.

Word testified that he and Bruner met six months before her death and they began living together a month later. They split expenses. She covered the rent and he

7

covered food, utilities, and living expenses.  He had "very unsteady" work as a casual longshoreman, working only once every three to four weeks, which was "very hard financially."  He knew that Bruner did not have any income but was not sure how she came up with money.  He "believe[d] she had money in the bank" but did not know because she "was kind of private about her finances."  His own savings had run out and he "was living off [his] mother's generosity."  Their financial problems "created a lot of stress ... , anger, sadness, [and] depression."

Bruner "felt her life was practically ruined" by the car accident and the "constant pain."  Although she was a "very strong" and "independent woman," Word helped her with certain things "on a daily basis," such as taking a shower and getting dressed.

They "argued ... a lot, especially towards the end ..., and [their] fights would escalate and sometimes turn physical."  Bruner "would get mad" and "would run to [him and] try to hit [him]."  She "was an angry woman and sometimes manifested that in a very violent way."  Word also would get angry when they fought.  They both "would break things, throw things, punch walls, things like that," though "mostly, it was just ... loud arguing, yelling, [and] screaming."  When Bruner hit him, he would try to deflect her blows, restrain her, push her away, or wrap his arms around her, but he never struck her.

Bruner "never directly said [to Word] that she wanted to commit suicide.  Most of it was ... in jest or insinuation."  If she was upset, "she would leave the room saying, 'why don't I just end it ... and make everyone happy' or things of that nature."  They both often "talked about wanting to die."  The month before they moved into the Long Beach apartment, Bruner got a tattoo with the phrase "born to die."

The day Bruner died "started off ... good."  They woke up, made love, Word made breakfast for them, and they took a shower together.  Bruner left for her doctor's appointment around midmorning.  When she returned in the late afternoon, her demeanor was "[m]uch different than when she had left.  She seemed "detached" and

8

Word "could tell something was bothering her." He asked her how the appointment went, and "she said she didn't want to talk about it." She went into the bedroom and "dropped her stuff."

After about five minutes Bruner came back into the living room and sat down on the couch with Word. Bruner asked him "how [they] were [going to] make rent next month." According to Word, "[t]he fight went from zero to ten in a very short amount of time." Bruner was "storming around the apartment, kicking things, [and] knocking things over." She was both sad and angry, crying and yelling, and "it was hard [for Word to] follow" what she was saying. He had "never seen her like [that] before." She yelled that "she was tired of everything, tired of being in pain." They "locked eyes," and there was something different about her expression that scared him. He "knew that she ... wanted to kill herself."

Bruner ran to the bedroom and grabbed Word's revolver. Word ran after her and wrestled it away from her. He went back to the living room to unload it and put it in the gun case. She was behind him, hitting him, screaming and crying, and trying to get the gun back. Word had three fingers around the handle of the gun with his forefinger flush against the side, outside the trigger. Bruner had her hand around his wrist and then grabbed "the top of the gun" with her hand wrapped around the cylinder. She pulled at the gun and Word turned to face her.

Word told her to give him the gun. She "brought the gun up to her mouth and inserted the barrel into [it]." He tried to pull it back and told her to "stop" and "let the gun go." The gun fired and she fell to the floor. Word "didn't intentionally pull the trigger" and "was trying to keep [his] finger off [of it]." He did not pull the hammer back to cock the gun and did not see Bruner pulling it back, although earlier in the bedroom he saw her hand make contact with it. He never kept the gun's safety engaged, since there were no children in the home.

After Bruner collapsed, Word "didn't want her to go alone." He told her, "I'm coming." He picked up the gun, put it under his head, and pulled the trigger. When

he woke up, he thought there was a chance she could wake up too, so he wanted to get help as fast as possible.

## DISCUSSION

### *Sufficiency of the Evidence*

Word contends that the evidence was insufficient to support the jury's finding that he murdered Bruner with premeditation and deliberation. In reviewing claims of insufficient evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Maciel* (2013) 57 Cal.4th 482, 514-515.) We do not reweigh the evidence or reassess the credibility of witnesses. (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) We accept the logical inferences that the jury might have drawn from the evidence even if we would have concluded otherwise. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.) If the trier of fact's findings are reasonably justified by the circumstances, the opinion of the reviewing court that a contrary finding might also reasonably be reconciled with the circumstances does not warrant reversing the judgment. (*People v. Jones* (2013) 57 Cal.4th 899, 961.)

Word relies on the often-cited *People v. Anderson* (1968) 70 Cal.2d 15, which held that evidence sufficient to sustain a finding of premeditation and deliberation may include evidence of planning and motive and the manner in which the killing was committed. (*Id.*, at pp. 26-27.) These categories are merely descriptive guidelines to our analysis and are neither exclusive nor exhaustive. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081; *People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

There is evidence that Word planned the killing. The jury could have inferred that after arguing with Bruner in the living room, he went to the bedroom, picked up the gun, disengaged the safety, cocked the hammer, and returned to the living room where, after a struggle to force the gun into her mouth, he shot her. This is sufficient to show planning. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 34 [leaving altercation to

10

obtain murder weapon from another room shows planning], disapproved of on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.)

Word argues that "there is [no] evidence from which the jury could have inferred that [he] got the gun from the bedroom with the intent of using it to shoot Bruner in the living room." To the contrary, there is evidence that Bruner had never used a gun and did not know how to fire one, whereas Word owned the gun and had considerable firearms experience, suggesting that he was lying about who went to the bedroom to retrieve the murder weapon. As the prosecutor argued to the jury, his explanation that she would suddenly choose to kill herself using a weapon she did not know how to use "doesn't make sense." His credibility was further weakened by the numerous inconsistencies in his story. Of particular relevance in this context, he told the police, "during the struggle ... I must have clicked [off] the safety," but at trial he testified that he never kept the safety engaged. The jury was free to believe his original statement—that the safety was engaged and he disengaged it before he shot her—and conclude in light of his firearms experience that did so intentionally rather than, as he told the police, accidentally.

The evidence also supports the prosecution's theory that Word murdered Bruner and attempted to kill himself, and that he was motivated by his depression and feelings of abandonment. On the day of the murder and "for as long as [he could] remember," he felt depressed and abandoned and had "feelings of suicide." He and Bruner "were struggling financially." Word's truck had been impounded two months earlier, leaving him unable to visit his mother, with whom he was close. Word could not afford health insurance or medications, and his "pain level [on the day of the murder] was getting very high." He "tried to be as strong as possible," but he "just wanted to end the pain." He and Bruner "spent every ... day together" and he "didn't want to spend any time with anyone else." With no means to pay future rent, he and Bruner faced the

11

prospect of eviction and potentially living apart.[5] He told the jury that he did not want to live without her. The jury could have inferred that he did not want to die without her, either.

The manner of the killing further supports the finding of premeditation and deliberation. Bruner was unarmed, significantly smaller than Word, and one of her arms was paralyzed. Even if the jury believed his claim that she had been hitting him, she posed no serious threat. After he returned from the bedroom, he forced the gun into her mouth and restrained her functional arm, using such force that he chipped her tooth and left bruises on her arm. He then shot her in the head, ensuring that she would die. This is evidence that he was resolute in carrying out a preconceived plan to kill her. (See *People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 [manner of killing supported premeditation where defendant knocked victim down to the floor, rendering him vulnerable, and shot him while he tried to get up in a nonthreatening manner]; *People v. Casares* (2016) 62 Cal.4th 808, 827 ["victim's effort to escape the deadly threat ... does not undermine the inference of premeditation and deliberation flowing from the manner in which defendant killed [him]"].)

*People v. Boatman* (2013) 221 Cal.App.4th 1253 (*Boatman*), upon which Word relies, is similar only in that both cases involved a defendant who shot his girlfriend in the face after a fight and initially lied to the police that she had shot herself. In *Boatman*, the defendant was living with family members, who were present in the house. After shooting his girlfriend, he immediately told his brother to call the police and

_____

[5] Word testified, "We had promised each other no matter what, we were gonna do it together, whether we had to live with her mom or move up north to live with my mom…. No matter what happened, we would do it together." The jury was free to discredit this testimony and, regardless of Word and Bruner's plans, to conclude that Word had reason to be concerned that staying together was unrealistic. Not only did they have no money, Word apparently had strained relations with his family. Even though holidays were "extremely important to [his] family," he could not attend the family Thanksgiving celebration at his mother's home a few weeks before the murder because he was unable to get a ride there with any of his relatives in the area.

12

attempted to perform mouth-to-mouth resuscitation. (*Id.*, at p. 1261.) In the background of the 911 call, he could be heard "crying and repeatedly saying things like, '[n]oooo,' '[b]aby,' and '[b]aby are you alive, baby ....' " (*Ibid.*) When the police arrived, he told them to call an ambulance for his girlfriend. (*Id.*, at p. 1258.) On the way to the police station, "he cried and asked rhetorically how someone could 'go on with their life when they see something like that.' " (*Id.*, at p. 1267.)

Here, in contrast, Word shot Bruner in an isolated location—their apartment—with no one around to observe the crime or interfere. Following the shooting, Word tried to kill himself rather than seek medical assistance for Bruner. He called 911 only after his suicide attempt failed. Although he testified he was calling 911 to get her medical help because he thought she might still be alive, he told the operator to send the police rather than the paramedics when given the choice. When police arrived, he seemed withdrawn, not sad, and was not crying. In short, there was no evidence of his grief or remorse that would undermine the jury's finding that he acted with premeditation and deliberation, and sufficient evidence to support it.

*Instruction Not to Experiment with the Revolver*

Word contends that he was denied his federal constitutional rights to due process and to present a defense when, prior to deliberations, the trial court told jurors not to experiment with the revolver. Whether the trial court properly instructed the jury "is a legal question we review de novo." (*People v. Leeds* (2015) 240 Cal.App.4th 822, 830.) Whether the trial court unduly controlled the jury's consideration of evidence in the jury room is reviewed for abuse of discretion. (See *People v. Clair* (1992) 2 Cal.4th 629, 661.)

In between delivering the pre-deliberation instructions (CALCRIM No. 3550) and the alternate juror instructions (CALCRIM No. 3577), the trial court admonished the jury that "[t]he firearm will be in the jury room with you when you deliberate. Do not experiment with it. Don't pull the trigger to see how much force is required. Don't simulate the alleged incident in this case. You can examine it, but you

13

can't experiment with it." The trial court apparently sought to reconcile two standard instructions that it had given the jury: "You may examine whatever exhibits you think will help you in your deliberations" (CALCRIM No. 3550); and "Do not conduct any tests or experiments" (CALCRIM No. 201).

Word relies on several juror misconduct cases, which explain that "[n]ot every jury experiment constitutes misconduct." (*People v. Collins* (2010) 49 Cal.4th 175, 249 (*Collins*).) Jurors may "experiment" with evidence by " 'subject[ing] an exhibit to a more critical examination than [was] made of it in court and by such examination reach[] a conclusion upon a contested fact by a more careful scrutiny.' " (*Id.*, at p. 244.) In a case cited by *Collins*,[6] for instance, jurors did not commit misconduct by dismantling the defendant's rifle, alleged to be the murder weapon, to disprove his claim that the firing pin could not have left the marks found on expended cartridges at the scene of the crime. This was so because "[t]he question of whether defendant's rifle had fired [the cartridges] was squarely raised" at trial and "[t]heir examination ... fairly fell within the scope and purview of the evidence received." (*Ibid.*) "Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial." (*Id.*, at p. 249.)

We assume for the sake of argument that absent the admonition at issue, jurors would not have committed misconduct by pulling the revolver's trigger to feel how much force was required or by simulating the shooting incident. Just because the law does not forbid such experimentation, however, does not mean that the trial court must allow it. Jurors have no "right to conduct experiments during deliberations," as Word frames the issue. Whether to permit physical evidence in the jury room and to " 'instruct[] the jury in the nature of the use which they shall make of the exhibit' " is a matter left to the trial court's sound discretion. (*People v. Barrett* (1913) 22 Cal.App. 780, 785; see *People v. Lee* (1974) 38 Cal.App.3d 749, 757.)

---

[6] (*Taylor v. Commonwealth* (1893) 90 Va. 109.)

Here, the trial court's admonishment not to experiment with the revolver was a reasonable safety precaution. (Cf. *People v. Torres* (1971) 19 Cal.App.3d 724, 733 ["A revolver is a dangerous or deadly weapon ... even if unloaded and not operable"].) Moreover, any evidentiary value from experimentation would have been cumulative since the jury heard extensive expert testimony about the amount of pressure necessary to fire the gun with the hammer set in various positions. The trial court did not abuse its discretion in limiting the jury's use of the revolver during deliberations. Even if it had erred, "[m]ere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution. [Citation.]" (*People v. Carpenter* (1997) 15 Cal.4th 312, 393, abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176.)

*Prosecutorial Misconduct*

Word contends that the prosecutor committed misconduct by making various misstatements of the law to the jury during voir dire, closing argument, and rebuttal. Recognizing that he has forfeited these claims by failing to raise them at trial (*People v. O'Malley* (2016) 62 Cal.4th 944, 1009), he argues that his trial counsel's assistance was constitutionally ineffective.

" 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 835.) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the

15

prosecutor's statements.  [Citation.]'  [Citation.]"  (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.'  [Citation.]"  (*People v. Centeno*, *supra*, 60 Cal.4th at p. 674.)  The defendant "bears the burden of showing by a preponderance of the evidence that (1) counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice.  [Citations.]"  (*Ibid.*)

*Presumption of Innocence*

During voir dire, the prosecutor told prospective jurors, "[t]his idea of the presumption of innocence, it only is in existence when you're receiving evidence.  That's so that you can hear all of the evidence, right?  You don't want to start making conclusions before you've heard everything.  And so the defendant is presumed innocent while you're receiving the evidence, but once you have all of the evidence, there is no presumption of innocence.  Because once you have all the evidence and you go back there to make your decision, the only question is has the evidence proven beyond a reasonable doubt that the defendant is guilty?  That's the only question once you go back there."

This is a misstatement of the law.  "There is no doubt but that the presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury, and until they reach a verdict [citation] ...."  (*People v. Arlington* (1900) 131 Cal. 231, 235; see *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1407-1408 [prosecutor misstated law by twice telling jury during closing argument that "[t]he presumption of innocence is over"].)

The error was not prejudicial, however, for several reasons.  The prosecutor's misstatement occurred during voir dire, long before the close of evidence, which is when the risk of any prejudice from the comment would have arisen.  Moreover,

16

defense counsel had already told prospective jurors that Word "is presumed innocent" and "unless the prosecution proves otherwise, the presumption lasts throughout the entire case." Finally, after the close of evidence, the trial court properly instructed the jury on the presumption of innocence and that "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." During closing argument, both attorneys underscored the latter point.

The prosecutor told the jury that during deliberations it would receive a copy of the court's instructions, which jurors could read "as many times as you want." She told the jury, "[m]ake sure you understand it. Just because I say it means something doesn't mean it does mean that.... You will have the law back there with you to make sure you understand what it means." Likewise, defense counsel told the jury, "The law is not what the attorneys tell you.... [Y]ou are going to be given a big packet of jury instructions. The law is also not what the prosecutor told you that it was. [¶] ... It's what the law says it is."

"Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt." (*People v. Goldberg* (1984) 161 Cal.App.3d 170, 189-190.) The prosecutor's erroneous statement during voir dire was harmless. Accordingly, Word cannot establish his ineffective assistance claim based on his counsel's failure to object.

*Premeditation and Deliberation*

During closing argument, the prosecutor explained that the concept of premeditation and deliberation "means that you consider your options. You consider your choices." She then used the example of making a right hand turn while driving, and the many considerations that precede that decision, to explain how premeditation and deliberation can occur in a very short time. She concluded, "Every time you drive, you act with premeditation and deliberation. It happens in a second. The law doesn't require

17

that a certain amount of time pass. It just requires that there be evidence that you considered your choices before making your decision."

This was a correct statement of the law. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1127 ["[P]remeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly' "].) In asserting otherwise, Word misreads *People v. Avila* (2009) 46 Cal.4th 680 (*Avila*). In *Avila*, the Supreme Court *approved* the prosecutor's argument that "assessing one's distance from a traffic light, and the location of surrounding vehicles, when it appears the light will soon turn yellow and then red, and then determining based on this information whether to proceed through the intersection when the light does turn yellow, [is] an example of a 'quick judgment' that is nonetheless 'cold' and 'calculated.' " (*Id.*, at p. 715.) That the prosecutor in *Avila* then pointed out the obvious—"the decision to kill is similar, but ... not ... in any way ... the same" (*ibid.*)—was an additional reason the argument withstood scrutiny, not its saving grace.

The prosecutor's argument here was proper. Word's counsel was not ineffective for failing to make an unmeritorious objection. (*People v. Lucero* (2000) 23 Cal.4th 692, 732.)

*Burden of Proof*

The trial court instructed the jury, "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.) Defense counsel discussed this instruction in her closing argument, asserting that it was "reasonable to conclude that in the struggle, the hammer was engaged and the trigger was pulled accidentally[.] You also might find that the prosecution theory is reasonable that he did it on purpose. If you think, yeah, it's possible he did it on purpose, it's reasonable

18

he did it on purpose, yeah, it's also reasonable that they were involved in the struggle and it accidentally happened, if you're sitting there right now thinking these two things, the law says ... that you must accept the circumstantial evidence that points to innocence, not that you could decide which one you like the best but that the tie goes to the runner."

In rebuttal the prosecutor told the jury, "[Defense counsel] talked to you a little bit about the jury instruction regarding circumstantial evidence.  The key to that instruction and any of the instructions and what your job is as jurors is reasonableness.  When you consider all of the facts in this case, there are not two reasonable conclusions that you can come to.  You can't reasonably conclude that he accidentally fired the gun and that it's reasonable that he pulled it intentionally.  Those are mutually exclusive stories.  [¶]  Your job as jurors is to decide what the facts are, what happened.  So that's essentially the same as throwing your hands up in the air and saying, 'Well, I don't know. I don't know what decision I want to make here.'  But your job is to decide what happened with the evidence that you were given, and you were given enough evidence to determine the reasonable conclusion here is that he murdered her."

Word contends that this statement "misstated the prosecutor's burden of proof ... because [it] misled the jurors into believing that the prosecutor's burden was satisfied if it was reasonable to conclude that [he] was guilty, even if it was also reasonable to conclude that the shooting was an accident."  We disagree.  Taken in context, the prosecutor was merely disputing defense counsel's argument that the circumstantial evidence supported two reasonable conclusions.  The prosecutor then outlined the evidence that, in her view, made the prosecution's murder theory reasonable and Word's accident theory unreasonable.  There was nothing objectionable about the prosecutor's rebuttal argument, and Word's counsel reasonably did not object.  (*People v. Lucero*, *supra*, 23 Cal.4th at p. 732.)

*Cumulative Error*

Word asserts that cumulative error warrants reversal.  As we have found only one error, which was forfeited and harmless, there is nothing to cumulate.

DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


PERREN, J.


We concur:



GILBERT, P. J.



YEGAN, J.

Richard R. Romero, Judge

Superior Court County of Los Angeles

_____


Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and John Yang, Deputy Attorney General, for Plaintiff and Respondent.